**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA and SOUTH CAROLINA DEPARTMENT OF ADMINISTRATION, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| DEB HAALAND, in her official capacity as United States Secretary of the Interior; THE UNITED STATES DEPARTMENT OF THE INTERIOR; THE UNITED STATES FISH AND WILDLIFE SERVICE; MARTHA WILLIAMS, in her official capacity as Chief of the U.S. Fish and Wildlife Service; MIKE OETKER, in his official capacity as Acting Regional Director, Southeast Region, United States Fish and Wildlife Service; CYNTHIA MARTINEZ, in her official capacity as Chief of the National Wildlife Refuge System; and SARAH DAWSEY, in her Official capacity as Manager of the Cape Romain National Wildlife Refuge, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 2:23-cv-3651-BHH   **INTERVENOR-DEFENDANTS' PROPOSED MOTION TO DISMISS AND MEMORANDUM IN SUPPORT** Fed. R. Civ. P. 12(b)(1) and (6) |
| Defendants, | ) ) ) | |
| and | ) ) | |
| DEFENDERS OF WILDLIFE and SOUTH CAROLINA COASTAL CONSERVATION LEAGUE, | ) ) ) ) | |
| Intervenor-Defendants. | ) ) | |

Intervenor-Defendants Defenders of Wildlife and South Carolina Coastal Conservation

League respectfully move the Court to dismiss the Amended Complaint of the State of South

1

Carolina and the South Carolina Department of Administration (together, the "State") in its entirety pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). *See* ECF No. 5.

The State's case challenges the authority of the United States Fish and Wildlife Service (the "Service") to regulate any commercial or recreational saltwater fishery in Cape Romain National Wildlife Refuge ("Cape Romain" or the "Refuge"). Cape Romain is a pristine wildlife refuge north of Charleston founded to protect migratory birds and species listed under the Endangered Species Act. The Service has a mandate under the National Wildlife Refuge System Administration Act of 1966, as amended by the National Wildlife Refuge System Improvement Act of 1997 (hereinafter, "Refuge Act"), to "ensure" that Cape Romain's founding purposes "are carried out." 16 U.S.C. § 668dd(a)(4)(D). This plainly includes the authority to manage the time, place, and manner of saltwater fishing and harvesting in the Refuge as needed to protect Refuge purposes. *See id*. §§ 668dd(c), (d)(1) (a)(3)(D). In prior litigation over horseshoe crab harvesting in Cape Romain, this Court expressly adopted the view that the Refuge Act provided the Service with this broad authority to protect refuge resources. *See Defenders of Wildlife v. U.S. Fish and Wildlife Serv.*, 539 F. Supp. 3d 543, 558 (D.S.C. 2021). This is consistent with a prior ruling from this district court holding that the Service has broad authority to regulate commercial activities in the Refuge. *See Livings[t]on v. United States,* No. 2:15-cv-00564-DCN, 2016 WL 1274013, at *1 (D.S.C. Mar. 31, 2016).[1]

The State's complaint makes no mention of any of these Refuge Act authorities or this district court's prior decisions. Instead, the State solely relies on the argument that it has "exclusive" and absolute authority over all saltwater fisheries in the Refuge pursuant to a 1991

---

[1] Although Westlaw states the lead plaintiff's last name as Livingson, the docket demonstrates that the lead plaintiff's last name is actually Livingston. *See Livingston v. United States*, No. 2:15-cv-00564-DCN (D.S.C.).

agreement leasing portions of Cape Romain to the Service for management "as a national wildlife refuge." Ex. A, ECF No. 5-1 ("1991 Lease"). The State wrongly contends that this lease strips the Service of any management authority over saltwater fisheries in the Refuge. The State's central argument is implausible on its face, warranting dismissal of several claims under Rule 12(b)(6).

The State's complaint is also subject to dismissal on numerous independent grounds. As a threshold matter, the State's claims are unripe for judicial review. Several claims are also time-barred by the six-year statute of limitations for challenging federal agency action. In addition, Count Five does not state a plausible claim under the Tenth Amendment, and Count Six asserts "waiver and estoppel," which are defenses, not causes of action. For all these reasons, as set forth more fully below, the State's complaint must be dismissed in its entirety under Rules 12(b)(1) and 12(b)(6).

## **BACKGROUND**

### I.    **Cape Romain National Wildlife Refuge.**

In 1932, the federal government designated Cape Romain as a national wildlife refuge pursuant to the Migratory Bird Conservation Act, 16 U.S.C. §§ 703–712; ECF No. 5 ¶ 3; *see also* U.S. Fish & Wildlife Serv., *Compatibility Determination for the Harvest of Horseshoe Crabs, Cape Romain National Wildlife Refuge* at 1, 6 (July 2023) (hereinafter "2023 Compatibility Determination" or "CD," attached as Exhibit A).[2] Cape Romain was established "for use as an inviolate sanctuary, or for any other management purpose, for migratory birds," 16

---

[2] The Amended Complaint challenges the 2023 Compatibility Determination and directs the Court to its publication on the Service's website. ECF No. 5 ¶ 25. Thus, the Court may consider this document on a motion to dismiss. *See, e.g.*, *Sandviks v. PhD Fitness, LLC*, No. 1:17-cv-00744-JMC, 2018 WL 1393745, at *6 n.5 (D.S.C. Mar. 20, 2018) ("[A]n authentic document referred to . . . and integral to plaintiff's claims [] may also be considered [on a motion to dismiss].").

U.S.C. § 715d; "to conserve and protect migratory birds and other species of wildlife that are listed . . . as endangered species or threatened species and to restore or develop adequate wildlife habitat," *id.* § 715i; and "for the development, advancement, management, conservation, and protection of fish and wildlife resources," *id.* § 742f(a)(4), among other conservation purposes. *See* CD at 1.

Cape Romain encompasses over 66,000 acres of pristine barrier islands, salt marsh, and waters along the South Carolina coast north of Charleston. *Id.* at 6. The Refuge is home to dozens of species of migratory and resident shorebirds and seabirds and is "considered by some experts to be the best birding area in South Carolina." *Id.* (citation and quotations omitted). The Refuge also harbors multiple species protected by the Endangered Species Act and these species' critical habitat. *Id.* at 7.

One such species is the *rufa* red knot, a federally threatened shorebird experiencing a rapid population decline. *Id.* at 14. Each spring, red knots make a transpolar migration from wintering grounds in South America to breeding grounds in the Arctic, with many stopping in Cape Romain along the way. *Defenders of Wildlife*, 539 F. Supp. 3d at 549. The birds' stopover coincides with horseshoe crab spawning season, where the crabs emerge from the sea each spring to lay their tiny eggs on the shores of Cape Romain. CD at 9, 14. Red knots must consume thousands of these eggs during their short stopover in Cape Romain to build enough energy to survive their arduous migration and breed in the Arctic. *Id.*

## II.    <u>Statutory and Regulatory Background.</u>

The Refuge Act consolidated various management authorities for wildlife refuges into a single statute governing all refuges administered by the Service. 16 U.S.C. § 668dd(a)(1) ("[A]ll lands, waters, and interests therein administered by the Secretary as wildlife refuges are hereby

4

designated as the 'National Wildlife Refuge System'. . . which shall be subject to the provisions of this Section").

The mission of the National Wildlife Refuge System is "to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." *Id.* § 668dd(a)(2). In administering national wildlife refuges such as Cape Romain, the Service "shall . . provide for the conservation of fish, wildlife, and plants, and their habitats within the System," *id.* § 668dd(a)(4)(A), "ensure that the biological integrity, diversity, and environmental health of the System are maintained for the benefit of present and future generations of Americans," *id.* § 668dd(a)(4)(B), and "ensure that the mission of the System . . . and the purposes of each refuge are carried out," *id.* § 668dd(a)(4)(D).

Under the Refuge Act, "[n]o person shall . . . take or possess any fish, bird, mammal, or other wild vertebrate or invertebrate animals . . . within any [national wildlife refuge,] or enter, use, or otherwise occupy any such area [of any refuge] for any purpose [] unless such activities are . . . permitted" by the Service as "compatible with the major purposes for which such areas were established." *Id.* §§ 668dd(c), (d)(1). The Service "shall not . . . permit a new use of a refuge or expand, renew, or extend an existing use of a refuge, unless the [Service] has determined that the use is [] compatible" with the purposes of the refuge and the Refuge System. *Id.* §§ 668dd(d)(3)(A)(i), 668ee(1).

For a use to be "compatible," it must be a "wildlife-dependent recreational use or any other use of a refuge that, in the sound professional judgment of the [Service], will not materially interfere with or detract from the fulfillment of the mission of the System or the purposes of the

refuge." *Id.* § 668ee(1). Uses determined to be "compatible" by the Service are "subject to such restrictions or regulations as may be necessary, reasonable, and appropriate." *Id.* § 668dd(a)(3)(D). The Service may promulgate regulations to carry out its mandate under the Refuge Act, *id.* § 668dd(b)(5), including to "permit the use of any area within the System for any purpose," *id.* § 668dd(d)(1)(A), and to establish the process for determining whether a use of a refuge is a compatible use. *Id.* § 668dd(d)(3)(B).

**<u>Special Use Permit Regulations</u>**. The Service's regulations governing administration of units of the National Wildlife Refuge System apply to "areas of land and water held by the United States in fee title and to property interests in such land and water in less than fee . . . . For areas held in less than fee, the regulations . . . apply only to the extent that the property interest held by the United States may be affected." 50 C.F.R. § 25.11(a).

All areas of the Refuge System are closed to public access unless specifically opened for a use. 50 C.F.R. § 25.21(a). The Service may open a national wildlife refuge for a particular use only if the agency determines that it is a compatible use. *Id.* § 25.21(b). The Service "may only authorize public or private economic use of the natural resources of any national wildlife refuge . . . when [it] determine[s] that the use contributes to the achievement of the national wildlife refuge purposes or the National Wildlife Refuge System mission." *Id.* § 29.1.

The Service's regulations prohibit "conducting a commercial enterprise on any national wildlife refuge" without a "special permit." *Id.* § 27.97. The "commercial harvest of fishery resources" in a wildlife refuge requires a permit or refuge-specific regulation. *Id.* § 31.13. An economic use may be authorized "by appropriate permit only when [the Service has] determined the use on a national wildlife refuge to be compatible." *Id.* § 29.1. The Refuge Manager is

charged with determining whether a use is compatible, *id.* § 26.41, and, if it is, issuing a permit for that use. *Id.* § 25.41.

### III.    Relevant Management Conduct by the Service.

Pursuant to the Refuge Act, the Service has taken undertaken certain management activities relevant to the State's suit.

*The 2009 Closures.* In 2009, the Service promulgated regulations closing Cape Romain's Marsh Island, White Banks, and Sandy Point "to public entry" between February 15 and September 15 each year "to protect nesting birds." 74 Fed. Reg. 45,674, 45,696 (Sept. 3, 2009); 50 C.F.R. § 32.60(D)(5) (2009) (the "2009 Closures").[3]

*The 2021 Notice.* The Service in 2021 posted a notice on its website reminding the public of the requirements of the Special Use Permit regulations. The Notice states that "anyone who wishes to solicit or conduct commercial activities, including but not limited to, horseshoe crab harvesting within the boundaries of Cape Romain National Wildlife Refuge (Refuge) must apply for a Special Use Permit (SUP) from the U.S. Fish and Wildlife Service." U.S. Fish & Wildlife Serv., *Memorandum* (2021) (hereinafter "2021 Notice," attached as Exhibit B[4]).

*The 2023 Compatibility Determination.* After receiving two applications for Special Use Permits to commercially harvest horseshoe crabs in Cape Romain in 2022, the Service used public notice and comment procedures to determine whether the use is compatible with Cape Romain's purposes, CD at 3, 22, as required by law.

---

[3] These regulations were relocated to 50 C.F.R. § 26.34(mm) in 2019. *See infra* at 17.

[4] The Amended Complaint challenges and quotes heavily from the 2021 Notice. ECF No. 5 ¶¶ 21–24, 32–35, 39–40, 43, 47. Thus, the Court may consider this document on a motion to dismiss. *See supra* note 2.

In 2023, the Service issued a voluminous Compatibility Determination supported by the latest science concluding that the commercial harvest of horseshoe crabs during their spawning season and peak shorebird migration (from March 15 through July 15) is not compatible with the purposes of Cape Romain as a sanctuary for migratory birds and threatened and endangered species. CD at 1, 22–23. Among other things, the Service concluded that the harvest in the Refuge "will lead to a dramatic reduction in horseshoe crab eggs laid and therefore reduce the availability of this preferred food resource for red knots" that stopover in Cape Romain to refuel on the crab's eggs. *Id.* at 14. This "would significantly impact the migratory shorebirds" and "could negatively affect nesting success and long-term population viability." *Id.* The Service thus "concludes that horseshoe crab harvesting cannot be authorized during the spawning season which runs from March 15 through July 15." *Id.* at 22.

## IV.    **The Prior Litigation.**

In 2020, Defenders of Wildlife filed suit in this Court against the Service alleging that it had allowed the commercial harvesting of horseshoe crabs in Cape Romain without, inter alia, the required special use permits, and that the harvest removed a critical food source from the threatened red knot: horseshoe crab eggs. *Defenders of Wildlife*, 539 F. Supp. 3d at 547. The State of South Carolina intervened to dispute the Service's authority over harvesting in the Refuge.

This Court rejected the argument that the Service lacks any authority over harvesting in Cape Romain and granted a preliminary injunction against commercial horseshoe crab harvesting in the Refuge without a special use permit. *Id.* at 557–59 & nn. 4–5, 561–62. As the Court specifically found, "the fact that South Carolina can authorize certain fishing activities (whether commercial or not) does not override the Service's independent responsibilities and

duties under the Refuge Improvement Act." *Id.* at 559. After an appeal by intervenor-defendant Charles River Laboratories International, Inc., the Fourth Circuit stayed the district court's injunction without any explanation. The Fourth Circuit's ruling did not address the authority issues raised by the State and rejected by this Court. *See Defenders of Wildlife v. U.S. Fish & Wildlife Serv.*, No. 21-1589, ECF No. 19 (4th Cir. May 24, 2021). After this litigation, the Service issued the 2021 Notice. Plaintiffs dismissed their litigation. *See Defenders of Wildlife v. U.S. Fish & Wildlife Serv.*, No. 2:20-cv-03657-BHH, ECF No. 85 (D.S.C. Aug. 13, 2021).

## V.    **The Amended Complaint.**

In the Amended Complaint, the State asserts various claims challenging the 2009 Closures, which are well outside the six-year statute of limitations for challenging agency action; the 2021 Notice, which is not a final agency action; the 2023 Compatibility Determination, against which the State asserts an implausible lack-of-authority argument; as well as vague and unspecified "other actions" by the Service. *See* ECF No. 5 ¶¶ 43, 47, ¶¶ 19–27 (together, the "Challenged Conduct").

In Count One, the State claims that a 1991 agreement wherein the State leased portions of Cape Romain to the Service for management "as a national wildlife refuge," ECF No. 5-1 (the "1991 Lease"), strips the Service of any authority to manage any saltwater fishing or harvesting activities in the Refuge, reserving "sole" authority to the State over those activities. ECF No. 5 ¶¶ 29–31. In Count Two, the State asserts that the 2021 Notice is a substantive "rule" that violates the federal Administrative Procedure Act ("APA") because it was not promulgated through notice and comment rulemaking. *Id.* ¶¶ 32–36. In Counts Three and Four, the State asserts identical claims that the 2009 Closures, the 2021 Notice, and/or the 2023 Compatibility Determination are unlawful under the APA because they infringe on the State's exclusive

authority over saltwater fishing under the 1991 Lease. *Id.* ¶¶ 37–43. Count Five alleges that these management actions by the Service violate the Tenth Amendment to the U.S. Constitution. *Id.* ¶¶ 44–47. Count Six asserts that "waiver and estoppel" prevents the Service from arguing that it has any power to "control the harvesting or taking of saltwater species" in the Refuge based on its assent to the 1991 Lease. *Id.* ¶¶ 48–50.

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "allege[] sufficient facts 'to raise a right to relief above the speculative level' and 'to state a claim to relief that is plausible on its face.'" *Goldfarb v. Mayor of Baltimore*, 791 F.3d 500, 509 (4th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Courts accept well-pled facts as true and construe them in the light most favorable to the plaintiff, *Brockington v. Boykins*, 637 F.3d 503, 505 (4th Cir. 2011), but do not credit "'legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments.'" *United States v. Walgreen Co.*, 78 F.4th 87, 92 (4th Cir. 2023) (quoting *U.S. ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022)).

When evaluating a motion to dismiss for lack of subject matter jurisdiction, "the court does not have to accept the pleadings as true, and may go beyond the face of the complaint and consider evidence outside of the pleadings" without converting the motion to one for summary judgment. *Tetrev v. Pride Int'l, Inc.*, 444 F. Supp. 2d 524, 528–29 (D.S.C. 2006). On a motion to dismiss under Rule 12(b)(1) challenging the factual basis for subject matter jurisdiction, "the plaintiff bears the burden of proving jurisdiction by a preponderance of the evidence . . .." *Kuntze v. Josh Enterprises, Inc.*, 365 F. Supp. 3d 630, 636–37 (E.D. Va. 2019) (citing *Adams v. Bain*,

697 F.2d 1213, 1219 (4th Cir. 1982); *Kearns v. United States*, 505 F.3d 187, 196 (4th Cir. 2009)).

## ARGUMENT

The Amended Complaint is subject to dismissal on numerous independent grounds. *First*, to the extent the State challenges the Service's authority to manage horseshoe crab harvesting in the Refuge (the only fishing activity the State identifies that occurs in the Refuge of concern to it), all claims of the Amended Complaint must be dismissed for lack of ripeness under Rule 12(b)(1). The State's permitting agency for harvesting—the South Carolina Department of Natural Resources ("SCDNR")—has signed a Consent Decree entered by Judge Gergel barring the only horseshoe crab harvesters in South Carolina from harvesting anywhere in Cape Romain for at least five years and potentially longer. Because no one will seek, and the State will not issue, any authorization to harvest horseshoe crabs in Cape Romain for at least the next five years regardless of the Service's Challenged Conduct, the State's injuries are purely speculative and unripe for judicial review.

*Second*, Counts One, Three, Four, and Five challenge a regulation seasonally closing three of Cape Romain's islands "to protect nesting birds," ECF No. 5 ¶ 19, among other activities by the Service, *id.* ¶¶ 29–31, 37–47. Because these closures were promulgated in 2009, these challenges are time-barred by the six-year statute of limitations and must be dismissed under Rule 12(b)(6).

*Third*, Count Two challenges a 2021 Notice by the Service, asserting that it is a substantive "rule" that failed to go through public notice and comment under the APA. Yet the notice simply notifies the public of the longstanding statutory and regulatory requirements to obtain a "special use permit" for commercial uses in any national wildlife refuge, including

11

commercial horseshoe crab harvesting in Cape Romain. The actual rules establishing this requirement—the Special Use Permit Regulations—are not mentioned or challenged by the State. Because the Notice simply refers to existing legal requirements, it is not "agency action," much less a substantive "rule," and Count Two must be dismissed under Rule 12(b)(6).

*Fourth*, Counts One, Three, and Four challenge the 2023 Compatibility Determination on the grounds that the Service lacks any authority whatsoever to regulate saltwater fishing or harvesting in Cape Romain. This argument overlooks the Service's plain authority under the Refuge Act to ensure that such uses of the Refuge are compatible with Cape Romain's purposes and is implausible on its face, warranting dismissal of these challenges under Rule 12(b)(6).

*Fifth*, Count Five asserts that various conduct by the Service purportedly managing saltwater fishing or harvesting in Cape Romain violates South Carolina's exclusive authority over those activities under the Tenth Amendment to the United States Constitution. Because the Service's challenged conduct is plainly a valid exercise of its authority under the Refuge Act and Property Clause of the United States Constitution, Count Five does not plausibly assert a Tenth Amendment claim and must be dismissed under Rule 12(b)(6).

*Lastly,* Count Six asserts a claim for "waiver and estoppel." This count must be dismissed for failure to state a claim under Rule 12(b)(6) because these are defenses, not a cause of action.

## I.    <u>The State's Claims Must be Dismissed for Lack of Ripeness.</u>

The crux of the State's case is a challenge to the Service's management of horseshoe crab harvesting in the Refuge.[5] Indeed, the Amended Complaint does not mention any other fishery.

---

[5] All six Counts of the Complaint arguably challenge the 2023 Compatibility Determination, which finds that horseshoe crab harvesting during spawning season is not a compatible use, ECF No. 5 ¶ 26; the 2021 Notice, which specifically mentions commercial horseshoe crab harvesting, *id.* ¶ 21; and the 2009 Closures, to the extent they bar "harvesting" during certain times of year on the closed islands, *id.* ¶¶ 19–20.

To the extent all of the State's claims challenge the Service's management of horseshoe crab harvesting in Cape Romain, they must be dismissed for lack of ripeness pursuant to Rule 12(b)(1). *See Cole v. Long John Silver's Rests., Inc.*, 388 F. Supp. 2d 644, 647 (D.S.C. 2005) ("Like other challenges to a court's subject matter jurisdiction, motions raising the ripeness issue are treated as brought under Rule 12(b)(1)" (citation and quotations omitted)).

In South Carolina, horseshoe crabs are harvested solely for biomedical use by Charles River Laboratories International, Inc. Charles River and SCDNR signed a Consent Decree entered by Judge Gergel prohibiting the company and its contractors from harvesting horseshoe crabs anywhere in Cape Romain through and including the 2028 harvest season, and potentially longer. *See Defenders of Wildlife v. Boyles*, No. 2:22-cv-00112-RMG, (D.S.C. Aug. 23, 2023), ECF No. 160 at 7–9, 23 ¶ 30 (hereinafter "Consent Decree"). This means that no one will seek, and the State will not issue, any authorization to harvest horseshoe crabs in Cape Romain for at least the next five years (from 2024 to 2028).

In the agency action context, "the purpose of the ripeness doctrine is to 'prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision['s]…. [e]ffects [are] felt in a concrete way by the challenging parties.'" *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019) (quoting *Abbott Laby's v. Gardner*, 387 U.S. 136, 148–49 (1967)). In determining whether claims are ripe, courts consider "the hardship to the parties of withholding consideration" and "the fitness of the issues for judicial decision." *Am. Fed'n of Gov't Emp. v. Off. Of Special Couns.*, 1 F.4th 180, 188 (4th Cir. 2021) (citations and quotations omitted).

There is no hardship to the State from withholding review here. With respect to horseshoe crab harvesting, the sole harm alleged by the State is that the Service's actions "limit the scope of the State's authorization rights under the lease." ECF No. 5 ¶ 28. Yet because of the Consent Decree, there will be no horseshoe crab harvesting in the Refuge for the State to authorize until 2029 at the earliest. Thus, the Service's Challenged Conduct will not inflict any "practical harm" on the State's purported authority over harvesting until least 2029 and potentially longer. *See Oh. Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733–34 (1998) ("[A]n important consideration in light of this Court's modern ripeness cases" is whether the challenged conduct "now inflicts significant practical harm upon the interests" of the Plaintiff).

Where the alleged injury is "dependent on future uncertainties," the case is generally not "fit for decision." *See Am. Fed'n of Gov't Emps.*, 1 F.4 at 188 (citation and quotations omitted). The asserted harm to the State will only materialize if the parties to the Consent Decree opt not to exercise its express extension clause, *see* Consent Decree ¶ 30, and harvesters apply to SCDNR for authorization to harvest in Cape Romain for the 2029 harvest season or later. Where, as here, "an injury is contingent upon a decision to be made by a third party that has not yet acted, it is not ripe as the subject of decision in a federal court." *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013). If a harvester applies to SCDNR for an authorization to harvest horseshoe crabs in Cape Romain in a future harvest season after the expiration of the Consent Decree, the State "will have ample opportunity to later bring its legal challenge at a time when harm is more imminent and more certain." *Oh. Forestry Ass'n, Inc.*, 523 U.S. at 734.

In sum, South Carolina's challenge to the Service's management of horseshoe crab harvesting in Cape Romain presents just the sort of "abstract disagreement[]" lacking in "concrete . . . effects" that must be dismissed for lack of ripeness. *See Abbott Lab'ys*, 387 U.S. at

14

148–49.  Moreover, because the Amended Complaint does not challenge the Service's

management of any specified fishery other than horseshoe crab, the entire complaint must be

dismissed for lack of ripeness.

## II.    The State's Challenges to the 2009 Closures Alleged in Counts One, Three, Four, and Five are Time-Barred.

The State asserts multiple claims challenging the Service's authority to promulgate 50

C.F.R. § 36.34(mm), a seasonal closure of Marsh Island, White Banks, and Sandy Point to

"protect nesting birds." ECF No 5. ¶¶ 19, 31, 39, 43, 47. Count One alleges that the regulation is

"inconsistent with the lease" and thus void. *Id.* ¶ 31. Count Three alleges that the regulation is

"arbitrary and capricious, and therefore, unlawful and must be set aside." *Id.* ¶ 39. Count Four

alleges that the regulation is an unlawful action in violation of the APA. *Id.* ¶ 43. Count Five

alleges that the regulation violates the Tenth Amendment. *Id.* ¶ 47. Any claims challenging these

seasonal closures, however, are well outside the six-year statute of limitations, *see* 28 U.S.C. §

2401, because these closures were implemented by a regulation promulgated via notice-and-

comment rulemaking in 2009, *see* 74 Fed. Reg. 1838 (Jan. 13, 2009) (codified at C.F.R. **§**

32.60(D)(5) (2009)).

Pursuant to 28 U.S.C § 2401, "every civil action commenced against the United States

shall be barred unless the complaint is filed within six years after the right of action first

accrues." The six-year statute of limitations applies to claims challenging the government's

authority to issue regulations and claims brought under the APA. *See, e.g.*, *Hire Order Ltd. v.*

*Marianos*, 698 F.3d 168, 170 (4th Cir. 2012) (holding that the six-year statute of limitations

applied to a challenge to a regulation brought under the APA); *Jersey Heights Neighborhood*

*Ass'n v. Glendening*, 174 F.3d 180, 198 (4th Cir. 1999) (holding that challenges to a government

agency's actions are subject to the general six-year statute of limitations).

When a party brings a facial challenge to a regulation, the statute of limitations begins to run upon the agency's "final" action. *See Jersey Heights Neighborhood Ass'n,* 174 F.3d at 186 ("Conduct becomes reviewable under the APA upon 'final agency action,' 5 U.S.C. § 704, in other words, when 'the agency has completed its decision-making process, and [when] the result of that process is one that will directly affect the parties.'") (quoting *Franklin v. Massachusetts,* 505 U.S. 788, 797 (1992) (internal quotation marks omitted))). The Fourth Circuit has repeatedly held that in facial challenges to agency actions, "the limitations period begins to run when the agency publishes the regulation." *E.g.*, *Hire Order Ltd. v. Marianos*, 698 F.3d 168, 170 (4th Cir. 2012); *Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*, 983 F.3d 671, 682 (4th Cir. 2020).

The State's claims are clearly a facial challenge to 50 C.F.R. § 26.34(mm). The relevant allegations in Counts One, Three, Four, and Five challenge the lawfulness of the regulation and Service's authority to issue the regulation in the first place. *See, e.g.*, *Exela Pharma Scis., LLC v. Kappos*, No. 1:12-CV-469, 2012 WL 6697068 (E.D. Va. Dec. 21, 2012), *aff'd sub nom. Exela Pharma Scis., LLC v. Lee*, 781 F.3d 1349 (Fed. Cir. 2015) (holding that challenges to an agency's authority to issue regulations are facial challenges); *Outdoor Amusement*, 983 F.3d at 683 (noting that a claim is a facial challenge when it seeks "to enjoin the Rules as improperly issued.") The Amended Complaint does not challenge any particular application of 50 C.F.R. § 26.34(mm) nor does it challenge any new interpretation of the regulation.

Because the State challenges the regulation on its face, the statute of limitations began when the agency first promulgated the challenged provision. *See Outdoor Amusement*, 983 F.3d at 682 ("The Fourth Circuit has held that when 'plaintiffs bring a facial challenge to an agency [action] . . . the limitations period begins to run when the agency publishes the regulation.'")

(quoting *Hire Order Ltd. v. Marianos*, 698 F.3d 168, 170 (4th Cir. 2012)). The State specifically challenges 50 C.F.R. § 26.34(mm)(v), which closes areas of Cape Romain "to public entry from February 15 through September 15 to protect nesting birds." This regulation has been in effect since 2009, *see* 74 Fed. Reg. at 45,696 (codified at 50 C.F.R. § 32.60(D)(5)) (2009)) (publication of the challenged provision as a final rule), though the State makes no mention of that fact.

Since its promulgation in 2009, the regulatory provision the State challenges has continued in force. The only change since 2009 has been a purely ministerial relocation in the Code—from 50 C.F.R. 32.60(D)(5) to 50 C.F.R. § 36.34(mm). *See* 84 Fed. Reg. 30,317 (June 26, 2019) (discussing proposed reorganization of refuge regulations). The 2019 reorganization made no substantive changes to the provision the State challenges. *Id.* Importantly, the Service specifically noted that "[t]his reorganization *does not establish any new regulations, nor does it make any changes* to the enforcement of public use or hunting and sport fishing on Service lands." *Id.* (emphasis added).

The challenged regulation has therefore remained unchanged since 2009. *See* 74 Fed. Reg. at 45,696.  Because the statute of limitations has long since run, the State's challenges to the 2009 closure regulation alleged in Counts One, Three, Four, and Five are time-barred, ECF No 5 ¶¶ 19, 31, 39, 43, 47; 28 U.S.C § 2401, and should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6).

### III.    The State's Claim Challenging the 2021 Notice in Count Two Must Be Dismissed for Lack of Final Agency Action.

In Count Two, the Amended Complaint challenges the 2021 Notice posted by the Service to Cape Romain's website. ECF No. 5 ¶ 35. The State argues that the 2021 Notice exceeds the Service's authority and violates the APA. *Id.* The challenges to the 2021 Notice must be dismissed under Rule 12(b)(1) because it is not a final agency action subject to judicial review.

17

*See* 5 U.S.C. § 704; *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 882–83 (1990). The 2021 Notice simply reminds the public of the requirements of the Special Use Permit regulations under the Refuge Act, and thus is not final agency action.

The APA governs actions taken by federal agencies and limits judicial review of agency decisions to "final" actions. 5 U.S.C. § 704 (defining agency actions subject to judicial review under the APA); *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 882–83 (1990); *Invention Submission Corp. v. Rogan*, 357 F.3d 452, 459 (4th Cir. 2004) ("The APA does not provide judicial review for everything done by an administrative agency."). If a complaint challenges an agency action that does not qualify as a final, reviewable agency action under the APA, a court must dismiss the complaint for lack of subject matter jurisdiction. *Shipbuilders Council of Am., Inc. v. U.S. Dep't of Homeland Sec.*, 481 F. Supp. 2d 550, 555 (E.D. Va. 2007) (citing *Invention Submission Corp. v. Rogan,* 357 F.3d 452, 460 (4th Cir. 2004)).

To qualify as a reviewable action under the APA, the agency's action must both "mark the consummation of the agency's decision-making process" and "give rise to legal rights and obligations or be one from which legal consequences flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). An agency that "merely expresses its view of what the law requires of a party" typically does not take a final agency action under the APA. *Golden & Zimmerman, L.L.C. v. Domenech*, 599 F. Supp. 2d 702 (E.D. Va. 2009), *aff'd*, 599 F.3d 426 (4th Cir. 2010) (internal citations omitted).

Under this standard, the Court must dismiss Count Two. The 2021 Notice does not mark the consummation of any agency decision-making process under the first prong of *Bennett v. Spear*. The Notice only states that "anyone who wishes to solicit or conduct commercial activities, including, but not limited to, horseshoe crab harvesting within the boundaries" of the

18

Refuge "must apply for a Special Use Permit." Ex. B. Special use permits are required for commercial uses of national refuges under the Refuge Act's longstanding statutory and regulatory regime. *See supra* at 5–6.

The 2021 Notice challenged in Count Two is not the result of any decision-making process because it simply refers to Special Use Permits, which are established by the Refuge Act's statutory and regulatory regime. *Id*. The Notice does not purport to represent any final decision of the agency. Instead, the Service posted the Notice to "ensure clarity" and to serve as a "reminder" to the public. Ex. B. The Notice merely reminds the public of the existing legal regime under the Refuge Act and its implementing regulations, *see supra* at 5–6, stating that "anyone who wishes to solicit or conduct commercial activities, including, but not limited to, horseshoe crab harvesting within the boundaries of Cape Romain National Wildlife Refuge (Refuge) must apply for a Special Use Permit (SUP) from the U.S. Fish and Wildlife Service." The Notice therefore refers to existing statutory and regulatory requirements as to Cape Romain and does not constitute final agency action.

Count Two also fails to articulate a claim for relief because it fails the second prong of *Bennett v. Spear*—the Notice does not alter the regulatory regime or have any direct legal consequences. *Bennett v. Spear*, 520 U.S. at 178. To satisfy the finality requirement, agency action must "alter the legal regime." *See Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA*, 313 F.3d 852, 859 (4th Cir. 2002) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). When an agency only recites existing regulations, any legal obligations derive from that regulation, not the later guidance or memorandum reciting it. *See, e.g.*, *Delaware Valley Reg'l Ctr., LLC v. U.S. Dep't of Homeland Sec.*, 2023 WL 3863637, at * 6 (D.D.C. June 7, 2023) (noting that when an

agency reiterates already existing obligations this has "no independent legal authority" and is not final agency action).

The 2021 Notice does not impose any new legal duties on any parties. The obligation to obtain a special use permit such as that required here existed for decades prior to the Service's 2021 publication of the Notice. *See supra* at 5–6. Nothing in the Notice changes any aspect of this statutory and regulatory regime nor does it advance any new interpretation of this regime. Any legal obligations therefore flow from the Refuge Act and regulations themselves, not the Notice. *See Golden & Zimmerman, L.L.C. v. Domenech*, 599 F. Supp. 2d 702 (E.D. Va. 2009), aff'd sub nom. *Golden & Zimmerman, LLC v. Domenech*, 599 F.3d 426 (4th Cir. 2010) (quoting *Am. Tel. & Tel. Co. v. EEOC*, 270 F.3d 973, 975 (D.C. Cir. 2001)).[6] Because the Notice does not constitute final agency action, the court does not have subject matter jurisdiction to review it under the APA and must dismiss Count Two and other claims that rely on this Notice.[7]

## IV.     **The State's central claim in Counts One, Three, and Four—that the Service has no authority whatsoever to manage any saltwater fishery in Cape Romain—is implausible on its face, warranting dismissal.**

Counts One, Three, and Four against the Service rise and fall on the State's extreme theory that it has "exclusive" and absolute regulatory authority over every saltwater fishery in Cape Romain, and the Service has no authority whatsoever to manage any fishing or harvesting

---

[6]Additionally, the Notice implies that the Service will make future determinations on individual special use permit applications. Any legal rights and obligations are therefore dependent on the Service's future review of individual applications.

[7] While the State also argues that the Notice is a legislative rule that failed to follow proper rule making procedures, ECF No. 5 ¶ 35, a non-final agency action cannot constitute a legislative rule. *See Cal. Comtys. Against Toxics v. EPA*, 934 F.3d 627, 631 (D.C. Cir. 2019) ("[A]ll legislative rules are final.").

activities in this *federal wildlife refuge*—regardless of how these activities affect refuge wildlife. ECF No. 5 ¶¶ 1–2, 30–31 (Count One), 39 (Count Three), 43 (Count Four).

As noted above, this Court in the prior Cape Romain litigation rejected the precise claim made by the State here, finding that the Service has the authority "to regulate the time, place, and manner" of saltwater harvesting in Cape Romain "to preserve the Refuge's purposes as a sanctuary for migratory birds and endangered and threatened species." *Defenders of Wildlife*, 539 F. Supp. 3d at 558–559 & n.5. The Court twice stated "that it is not convinced at all" by the argument "that the Service has absolutely no authority to regulate any aspect of the horseshoe crab harvest in Cape Romain." *Id.* at n. 4 (citation and quotations omitted).[8]

The Court's views are consistent with the plain text of the Refuge Act and its implementing regulations and the Service's own position on its authority. *See* ECF No. 5 ¶ 28 ("At a minimum, FWS can limit the time, place and manner" of saltwater fishing and harvesting in Cape Romain). The State's 1991 Lease of certain portions of Cape Romain to the Service does not undermine, and in fact supports, the Service's authority to manage saltwater fisheries in the Refuge to ensure they are compatible with the Refuge's purposes and the refuge system's mission. Because the State's radical claims to the contrary "are rooted in implausible legal theories," Counts One, Three, and Four must be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. *See Hatchigan v. Sklar Law, LLC*, No. 22cv2866, 2022 WL 16857006, at *4 (E.D. Pa. Nov. 10, 2022).

> ### a.   *The 2023 Compatibility Determination Plainly Falls within the Service's Mandate under the Refuge Act.*

---

[8] Although the Fourth Circuit ultimately stayed this Court's order without explanation, there is nothing to suggest that the stay was based on a disagreement with this Court's findings on the authority issue.

Remarkably, the Amended Complaint makes no mention of the Refuge Act or the Service's mandate to "ensure" that Cape Romain's purposes "are carried out." 16 U.S.C. § 668dd(a)(4)(D). Overlooking the governing law, the State asserts various claims against three purported "actions" by the Service to manage saltwater fishing or harvesting in Cape Romain. As explained above, Counts One, Two, Three, Four, and Five are clearly time-barred and raise theories not premised on final agency action as to the 2009 Closures and the 2021 Notice, respectively. *See supra* at 15–21. Because of these flaws in any challenge to the 2009 Closures and the 2021 Notice, Intervenors do not discuss these allegations further here.

As to the 2023 Compatibility Determination, the State does not dispute the merits of the Service's finding that it is not compatible with the Refuge's purposes—i.e., to protect the Refuge's migratory birds and endangered or threatened species—to grant special use permits to allow commercial horseshoe crab harvesting during horseshoe crab spawning season from March 15 to July 15. Instead, the State alleges that the Service has no authority whatsoever to manage saltwater fishing or harvesting in the Refuge. Yet the issuance of the Compatibility Determination falls within any plausible reading of the Service's authorities under the Refuge Act.

After receiving two applications for SUPs and proceeding through notice and comment, the Service issued the 2023 Compatibility Determination concluding that commercial horseshoe crab harvesting in Cape Romain during the crabs' spawning season is not compatible with the purposes of the Refuge and the mission of the refuge system because, inter alia, it harms federally-threatened red knot birds, loggerhead sea turtles, piping plovers, and other shorebirds. CD at 14–23. The Service also determined that it has insufficient resources to police the harvest. *Id.* at 4–5. Critically, the Amended Complaint does not dispute any of the Service's findings.

22

Instead, the State again asserts in Counts One, Three, Four, and Five that the 2023 Compatibility Determination violates various laws because the Service lacks any authority to manage saltwater harvesting in the Refuge. ECF No. 5 ¶¶ 31, 39–40, 43, 47, 49–50. Yet as the Service noted in response to this precise argument, it "has the authority to manage the time, place, and manner of the collection of horseshoe crabs within all areas of the refuge." CD at 45 (citing this Court's opinion in *Defenders of Wildlife*); *see also id.* at 22 ("At a minimum, FWS can limit the time, place and manner of the scope of [South Carolina's] authorization." The Service specifically acknowledged that its authority over the harvest in the Refuge "is not exclusive," and that South Carolina also reserved non-exclusive authority under the 1991 Lease to authorize harvesting in the Refuge in the first instance. *Id.* at 22–23. Consistent with this concurrent authority, the Service simply restricted *when* these activities may occur in the Refuge—i.e., not during the crabs' spawning season. The Service's seasonal restriction on the commercial harvest of spawning horseshoe crabs to protect Cape Romain's purposes as a migratory and shorebird sanctuary goes to the heart of the agency's mandate under the Refuge Act. *See, e.g.*, 16 U.S.C. §§ 668dd(c), (d)(1) (prohibiting the taking of any fish or other species in a national wildlife refuge without a compatibility determination by the Service); 50 C.F.R. §§ 27.97, 29.1, 31.13 (requiring a special use permit and compatibility determination for all commercial activities in a wildlife refuge, including the "commercial harvest of fishery resources").

### b. *The Service Complied with its Federal Statutory Mandate Consistent with the 1991 Lease.*

The Service complied with its statutory authority under the Refuge Act to make the 2023 Compatibility Determination consistent with  the 1991 agreement wherein South Carolina "grant[ed], demise[d] and lease[d]" certain portions of Cape Romain to the Service for 99 years

subject to "[t]he right of the State of South Carolina to authorize the taking of shellfish, finfish, and other salt water species within the refuge boundary." ECF No. 5-1 at 2–3. Nowhere does the lease say, as the State claims, that its right to authorize fishing is "exclusive" or absolute, or that the Service "has no authority to restrict the taking of saltwater species within the leased area." ECF No. 5 ¶¶ 2, 15. To the contrary, as this Court has found, "the fact that South Carolina can authorize certain fishing activities (whether commercial or not) does not override the Service's independent responsibilities and duties under the Refuge Improvement Act." *Defenders of Wildlife*, 539 F. Supp. 3d at 559. "[T]he mere fact that the State has the authority to issue a permit authorizing fishing in the first instance (something everyone agrees about) does not mean that the Service consequently has no concurrent authority to regulate the time, place, and manner of a commercial enterprise to preserve the Refuge's purpose as a sanctuary for migratory birds and endangered and threatened species." *Id.* at 558.

Consistent with this concurrent regulatory regime, the 1991 Lease makes clear that Cape Romain "is being leased for administration by the Service as a national wildlife refuge." ECF No. 5-1 at 2. Of course, to administer Cape Romain "as a national wildlife refuge," the Service must preserve the Refuge's purposes as a sanctuary for migratory birds and endangered and threatened species. *E.g.*, 16 U.S.C. §§ 668dd(a)(4)(D), 715d, 715i. Far from undermining the Service's mandate, the 1991 Lease preserves a collaborative relationship where the State authorizes fishing in the first instance and the Service may regulate its time, place, and manner to protect Cape Romain's purposes and the mission of the National Wildlife Refuge System as a whole.

Against this plain reading of the 1991 Lease and the Refuge Act, the State posits a reading where its right to "authorize" fishing in the first instance bars the Service from doing

24

*anything* to manage the time, place, or manner of these activities as needed to protect Refuge purposes.

This is inconsistent with the Service's mandate to manage under the Refuge Act, and inconsistent with a prior decision from this District Court. In *Livings[t]on v. United States,* Judge Norton held that the Refuge Act empowers the Service to regulate the exercise of another reserved right under the 1991 Lease to the extent that it could "possibly affect" the Service's leasehold interest in Cape Romain. No. 2:15-cv-00564-DCN, 2016 WL 1274013, at *1, 3–4 (D.S.C. Mar. 31, 2016) (citing 50 C.F.R. § 25.11). Applying *Livings[t]on*, this Court has held that the 1991 Lease does not "invalidate the Service's regulatory authority" because there is nothing to indicate that commercial horseshoe crab harvesting "*cannot possibly affect*" the Service's leasehold interest in Cape Romain. *Defenders of Wildlife*, 539 F. Supp. at 558–59.

In short, there is no plausible argument that the Service lacks authority to take the actions (and non-action) challenged in the Amended Complaint. No factual development could alter this conclusion, which is apparent on the face of the Complaint, the Refuge Act, and the 1991 Lease. Because Counts One, Three, and Four all rise and fall with the State's implausible authority argument, those claims must be dismissed under Fed. R. Civ. P. 12(b)(6).

## V.    Count Five Does Not Plausibly Allege a Tenth Amendment Claim, Warranting Dismissal.

Count Five of the Amendment Complaint alleges that "[t]he Regulation, Memorandum, Compatibility Determination and any other actions [by the Service] that would restrict the State's authority over the taking or harvesting of saltwater species" violate the Tenth Amendment of the United States Constitution. ECF No. 5 ¶¶ 44–47. That Amendment provides that "[t]he powers *not delegated to the United States* by the Constitution, nor prohibited to it by the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X (emphasis added).

Thus, "[i]f power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States." *New York v. United States*, 505 U.S. 144, 156 (1992).

The Property Clause of the Constitution delegates to Congress—and thus, does not reserve to the States—"the Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, § 3, cl. 2. The Refuge Act is an exercise of Congress' power under the Property Clause, delegating authority to the Service to manage and protect the United States' interests in national wildlife refuges. *Nat'l Audubon Soc'y v. Davis*, 307 F.3d 835, 854 (9th Cir. 2002). It is "painfully apparent" that the Tenth Amendment does *not* reserve to states the unrestricted power to manage wildlife in a national wildlife refuge regardless of the circumstances. *Wyoming v. United States*, 279 F.3d 1214, 1227 (10th Cir. 2002); *accord Davis*, 307 F.3d at 854.

As to Cape Romain specifically, this Court has twice held that the Service's regulation under the Refuge Act of activities that the State reserved in the 1991 Lease were valid exercises of Congress' Property Clause authority—so long as those activities *may affect* the federal leasehold interest in Cape Romain. *Livings[t]on*, 2016 WL 1274013, at *3–4 (citing 50 C.F.R. § 25.51); *Defenders of Wildlife*, 539 F. Supp. 3d at 556–59 (same). As explained above, the Service's 2023 Compatibility Determination is plainly authorized by the Refuge Act and manages the time, place, and manner of a fishery that *will* affect the Service's leasehold interests in protecting Cape Romain's purposes and the mission of the National Wildlife Refuge System. *Supra* at 24–26. Thus, the Service's challenged conduct is a valid exercise of Property Clause authority as expressed in the Refuge Act. *Id.*

26

In sum, the Service has plain and "preeminent" authority under the Refuge Act and Property Clause to manage the time, place, and manner of saltwater fisheries in Cape Romain. *See Wyoming*, 279 F.3d at 1233–34. The 2023 Compatibility Determination is plainly a valid exercise of that authority, the State's Tenth Amendment claim is implausible and must be dismissed under Rule 12(b)(6).

## VI.    Waiver and Estoppel are Defenses, not Causes of Action, Warranting Dismissal of Count Six.

Count Six asserts a cause of action for "waiver and estoppel." ECF No. 5 ¶ 48–50. In support of this "claim," the State alleges that that the Service, by its "course of conduct" and assent to the 1991 Lease, "waived any claim that, *arguendo*, they may have to the control the [*sic*] harvesting or taking of saltwater species and are estopped to deny that the State has such authority." *Id.* ¶¶ 49–50.

It is entirely unclear what the State's cause of action is here. Waiver and estoppel are defenses, not affirmative claims. *E.g.*, *Webb v. Reames*, 326 S.C. 444, 447, 485 S.E.2d 384, 385 (S.C. Ct. App. 1997); 7 S.C. Jur. Estoppel & Waiver § 21 ("Waiver, like estoppel, is [an] affirmative defense."); *see also Johnson v. Life Investors Ins. Co. of Am.*, 216 F.3d 1087 (Table), at *6 (10th Cir. July 11, 2000) ("[E]stoppel is normally asserted as a defense to a claim or right and does not create an independent cause of action."); *Allstate Ins. Co. v. Jean-Pierre*, No. 3:10-cv-506 (VLB), 2011 WL 3837085, at *6 (D. Conn. Aug. 30, 2011) ("[W]aiver and estoppel … may not be raised affirmatively as causes of action."); *Apple, Inc. v. Motorola Mobility, Inc.*, No. 11-cv-178-bbc, 2011 WL 7324582, at *1 (W.D. Wisc. June 7, 2011) (granting "motion to dismiss Apple's claim of waiver because waiver is an affirmative defense, not a cause of action"); *Burnette v. Wells Fargo Bank, N.A.*, No. 4:09-CV-370, 2011 WL 676955, at *3 (E.D.

Tex. Jan. 27, 2011) (same); *BA Mortg. & Int'l Realty Corp. v. Am. Nat'l Bank & Trust*, 706 F. Supp. 1364, 1369 (N.D. Ill. 1989) (same).[9]

For these reasons, Count Six must be dismissed for failure to state a claim under Rule 12(b)(6).

## <u>CONCLUSION</u>

For the reasons stated herein, the Amended Complaint should be dismissed in its entirety under Rules 12(b)(1) and (b)(6).

Respectfully submitted,

<u>s/ Catherine M. Wannamaker</u>
Catherine M. Wannamaker
Bar No. 12577
Carl T. Brzorad
Bar No. 105413
Southern Environmental Law Center
525 E. Bay St., Ste. 200
Charleston, SC 29403
cwannamaker@selcsc.org
cbrzorad@selcsc.org
Telephone: (843) 720-5270

*Attorneys for Intervenor-Defendants*

Charleston, South Carolina
October 18, 2023

---

[9]Aside from this fatal defect, the defenses of waiver and estoppel have defined elements that have not been plausibly alleged by the State. "[E]quitable estoppel focuses on a party's detrimental reliance on another party's conduct while a waiver analysis focuses on a party's unequivocal intent to relinquish a known right." *Strickland v. Strickland*, 375 S.C. 76, 85–86 (2007) (citation and quotations omitted). The Amended Complaint contains no allegation of detrimental reliance by the State on any conduct by the Service. Moreover, it is "well established that [] estoppel [] and waiver based on inaction *do not apply against the Government in situations where it is seeking to enforce its property rights*." *U.S. ex rel. Tenn. Valley Auth. v. Bagwell*, 698 F. Supp. 135, 137 (1988) (emphasis added); *accord Utah Power & Light Co. v. United States*, 243 U.S. 389, 409 (1917) ("[N]eglect of duty on the part of officers of the Government is no defense to a suit by it to enforce a public right or protect a public interest. . . . A suit by the United States to enforce and maintain its policy respecting lands which it holds in trust for all the people stands upon a different plane in this and some other respects from the ordinary private suit").