IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| State of South Carolina and South Carolina Department of Administration,<br><br>    Plaintiffs,<br><br>v.<br><br>Deb Haaland, in her official capacity as United States Secretary of the Interior; the United States Department of the Interior; the United States Fish and Wildlife Service; Martha Williams, in her official capacity as Chief of the U.S. Fish and Wildlife Service; Mike Oetker, in his official capacity as Acting Regional Director, Southeast Region, United States Fish and Wildlife Service; Cynthia Martinez, in her official capacity as Chief of the National Wildlife Refuge System; and Sarah Dawsey, in her official capacity as Manager of the Cape Romain National Wildlife Refuge,<br><br>    Defendants,<br><br>and<br><br>Defenders of Wildlife and South Carolina Coastal Conservation League,<br><br>    Intervenor-Defendants. | Civil Action No. 2:23-cv-3651-BHH<br><br>**Amended Order and Opinion** |

This matter is before the Court upon Intervenor-Defendants' motion to dismiss this action, filed pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure. (ECF No. 17.) The matter has been fully briefed, and the Court held oral argument on the motion on Wednesday, August 28, 2024. For the reasons set forth on the record during

the hearing and for the reasons set forth herein, the Court grants Intervenor-Defendants' motion and dismisses this action.

## BACKGROUND

The State of South Carolina and South Carolina Department of Administration ("the State" or "Plaintiffs") initiated this action on July 28, 2023, by filing a complaint against the following named Defendants: Deb Haaland, in her official capacity as United States Secretary of the Interior; the United States Department of the Interior ("the Department"); the United States Fish and Wildlife Service ("the Service"); Martha Williams, in her official capacity as Chief of the Service; Mike Oetker, in his official capacity as Acting Regional Director, Southeast Region, United States Fish and Wildlife Service; Cynthia Martinez, in her official capacity as Chief of the National Wildlife Refuge System; and Sarah Dawsey, in her official capacity as Manager of the Cape Romain National Wildlife Refuge (collectively, "the federal Defendants"). (ECF No. 1 at 1.) On August 17, 2023, the State filed an amended complaint against the same Defendants, again asserting that "a controversy has arisen between the Plaintiffs and Defendants over the control of the 'taking of shellfish, finfish, and other salt water species within the refuge boundary' of the Cape Romain National Wildlife Refuge[1] ("Cape Romain" or "the Refuge") under a lease executed with the United States Fish and Wildlife Service by the Budget and Control Board of the State on February 21, 1991." (ECF No. 5 at 1-2.) The State attached to its amended complaint a copy of the lease executed by the State and the Service on February 21, 1991,

---

[1] Cape Romain, which is located in Charleston County, South Carolina, was created by Congress in 1932 "for use as an inviolate sanctuary, or for any other management purpose, for migratory birds." 16 U.S.C. § 715d.  Pursuant to the Refuge Improvement Act, Cape Romain is now administered by the Secretary of the Interior and the Service as part of the National Wildlife Refuge System.

("**the 1991 Lease**"), a map of Cape Romain, a 1969 grant of easement between the State and the Service, and a letter dated April 22, 1991, from the State Budget and Control Board to the Department with an attached Opinion of the Office of Attorney General No. 1855 from May 13, 1965. (*See* ECF Nos. 5-1, 5-2, 5-3, 5-4.)

On October 28, 2023, Defenders of Wildlife ("Defenders") and South Carolina Coastal Conservation League ("SCCCL") (collectively, "Intervenor-Defendants") filed a motion to intervene as Defendants under Rule 24(b) of the Federal Rules of Civil Procedure, which this Court granted without opposition on November 3, 2023. (ECF Nos. 14, 18.) Also on November 3, 2023, Intervenor-Defendants filed the instant motion to dismiss pursuant to both Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction due to lack of ripeness and Rule 12(b)(6) for failure to state a claim based on a number of grounds.[2] (ECF No. 17.) The State filed a response in opposition to the motion, and the federal Defendants filed a response in support of the motion. (ECF Nos. 25, 26.) The State filed a reply to the federal Defendants' response, and the Intervenor-Defendants filed a reply to the State's response. (ECF Nos. 31, 32.) On July 18, 2024, the State filed a notice of supplemental authority. (ECF No. 34.)

According to the amended complaint, the 1991 Lease "covers approximately half of

---

[2] Specifically, in addition to asserting that the State's claims are not ripe, Intervenor-Defendants argue the following: that counts one, three, four, and five are time-barred because they challenge a regulation that seasonally closes three islands to protect nesting birds, but the closures were promulgated in 2009; that the 2021 Memorandum and is not a "rule" that failed to go through public notice and comment under the APA; that counts one, three, and four, which challenge the 2023 Compatibility Determination, overlook the Service's plain authority under the Refuge Act to ensure that uses of the Refuge are compatible with Cape Romain's purposes; that the State's fifth cause of action does not allege a plausible Tenth Amendment claim because the Service's challenged conduct is a valid exercise of its authority under the Refuge Act and the Property Clause of the United States Constitution; and that the State's sixth cause of action for waiver and estoppel is a defense and not a cause of action. (*See* ECF No. 17.)

the area within the Cape Romain National Wildlife Refuge and expressly states that it is '[s]ubject to . . . the right of the State of South Carolina to authorize the taking of shellfish, finfish and other salt water species within the refuge boundary.'" (ECF No. 5 at 2.)  In the amended complaint, the State alleges:

> Under the lease, the State has exclusive control over the taking or harvesting of salt water species on lands below mean high water on Marsh Island within the Refuge and any other such areas below mean high water covered by the lease, including, but not limited to, commercial taking or harvesting.  The letter of April 22, 1991 from the State of South Carolina to the Department of the Interior and the Opinion of the Office of the Attorney General attached thereto make clear that the State of South Carolina understood that the lease "retains the State's right to the taking of salt water species . . ." and that under the Opinion the State "did not have the authority to lease the tidelands and submerged lands in any way that will interfere with the public rights of navigation and fishing and other public purposes." [ ] The United States has no authority to restrict the taking of salt water species within the leased area.

(*Id.* at 5.)

The State asserts that the Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 5 U.S.C. §§ 702-703, and that the Court may issue declaratory relief pursuant to 5 U.S.C. §§ 705-706 and 28 U.S.C. §§ 2201 and 2202.  (ECF No. 5 ¶ 16.) The State further contends it is entitled to bring this action pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701-06 ("APA").  (*Id.*)

According to the State, the federal Defendants have violated the 1991 Lease by taking the following actions.  First, the State complains that a regulation promulgated by the Service in 2009, namely, 50 C.F.R. § 32.60(D)(5) (2009), *relocated to* 50 C.F.R. § 26.34(mm) in 2019, ("**the 2009 Regulation**") violates the 1991 Lease because it closes entry to specified areas between mean high and low water marks and thereby bars the harvesting of salt water species under the 1991 Lease.  The 2009 Regulation provides, in

4

pertinent part, that with respect to Cape Romain: "We close Marsh Island, White Banks, and Sandy Point to public entry from February 15 through September 15 to protect nesting birds.  This closed area extends from the low mean water mark to the highest elevation on these islands."  50 C.F.R. § 26.34(mm).

Second, the State complains that a Memorandum issued by the Service on August 6, 2021, ("**the 2021 Memorandum**") is inconsistent with the Service's conduct since the 1991 Lease has been in effect and is inconsistent with the 2009 Regulation outlined above.  In the 2021 Memorandum, the Service directed the Refuge Manager at Cape Romain to post the following notice:

> Beginning August 15, 2021, anyone who wishes to solicit or conduct commercial activities, including, but not limited to, horseshoe crab harvesting within the boundaries of Cape Romain National Wildlife Refuge (Refuge) must apply for a Special Use Permit (SUP) from the U.S. Fish and Wildlife Service.
>
> If a SUP is issued, the permittee must comply with all special conditions attached to that SUP.
>
> Reminder: The entire Refuge is closed from sunset to sunrise, and specific areas within the Refuge are subject to periodic closures.  These closures take precedence over any authorization contained in a SUP.

(ECF No. 17-2.[3])

According to the State, the 2021 Memorandum is inconsistent with the 2009 Regulation because "it expands the closures in the Regulation to year round and in doing so also violates the lease."  (ECF No. 5 at 7.)  Additionally, the State contends that the

---

[3] Although the amended complaint refers to the "attached" Memorandum, no copy of the 2021 Memorandum is attached to its pleading.  (*See* ECF No. 5 at 6.)  The federal Defendants attached a copy of the 2021 Memorandum to their motion to dismiss, and because this document is referenced in and is integral to Plaintiff's complaint, the Court may properly consider this in connection with Defendants' motion.  (*See* ECF No. 17-2.)

2021 Memorandum functions as a "rule" under 5 U.S.C. § 551(4) and that it violates the APA because it did not undergo the notice and comment procedure under 5 U.S.C. § 553.

Next, the State complains about a "Compatibility Determination for the Harvest of Horseshoe Crabs, Cape Romain, National Wildlife Refuge," which the Service issued on August 7, 2023, ("**the 2023 Compatibility Determination**") after having received two applications for Special Use Permits to commercially harvest horseshoe crabs in Cape Romain in 2022.[4] In the 2023 Compatibility Determination, the Service found that the harvest of American horseshoe crabs is "not compatible with the purposes for which the Refuge was established and the mission of the National Wildlife Refuge System" and "that horseshoe crab harvesting cannot be authorized during the spawning season which runs from March 15 through July 15." (ECF No. 17-1 at 23.) According to the State, certain portions of the 2023 Compatibility Determination are wrong, both because the State's reserved right in the 1991 Lease "to authorize the taking of shellfish, finfish and other salt water species within the refuge boundaries" is exclusive, and because "[t]he Service has no authority to limit the scope of the State's authorization rights under the lease in any time, place or manner."[5] (ECF No. 5 at 8.) The State then asserts that "this suit is brought to

---

[4] Although the State does not attach a copy of the 2023 Compatibility Determination to its amended complaint, it refers to the location where it may be found on the Service's website, and the federal Defendants attached a copy to their motion to dismiss. (*See* ECF No. 17-1.) Because this document is referenced in and is integral to Plaintiff's complaint, the Court may properly consider it in connection with Defendant's motion.

[5] The 2023 Compatibility Determination includes the following statement regarding the 1991 Lease:

> [The Service's] regulatory authority over the submerged lands of the Refuge is not exclusive. This is because in the 1991 lease of the submerged lands within the Refuge, the State of South Carolina reserved the right "to authorize the taking of shellfish, finfish and other salt water species within the refuge boundaries." That reserved right is not exclusive, either. At a minimum, [the Service] can limit the time, place and manner of the scope of that authorization.

6

protect the rights of the State under the lease and not for the purpose of determining whether horseshoe crabs should or should not be protected." (*Id*.)

In the amended complaint, the State includes the following six causes of action:

(1) Pursuant to the 1991 lease, the U.S. Fish and Wildlife Service lacks authority to control or otherwise limit the taking or harvesting of salt water species in the Refuge;

(2) The August 2021 Memorandum is a rule that is invalid because it failed to follow notice and comment procedures under the APA;

(3) Arbitrary, capricious action in violation of the APA;

(4) Unlawful action in violation of the APA;

(5) Tenth Amendment; and

(6) Waiver and Estoppel.

(ECF No. 5 at 8-11.)

In the prayer for relief, the State asks the Court to:

(1) Issue a declaratory ruling that the Service lacks authority to impose any limits on the taking or harvesting of salt water species in the Refuge and that the 2021 Memorandum, Regulation 50 C.F.R. 26.34 (mm), Compatibility Determination, and any related actions including the closure of Marsh Island and requirements of special use permits are invalid;

(2) Issue an injunction barring the Service from enforcing the Memorandum, Regulation, the Compatibility Determination, requiring special use permits, closing Marsh Island, or taking any other action that would restrict the State's authority to control the taking or harvesting of salt water species within the Refuge;

(3) Award all costs and expenses of this action; and

(4) Award such additional relief as the Court deems proper.

(*Id.* at 12.)

---

(ECF No. 17-1 at 23.)

Before turning to the specific arguments raised in Intervenor-Defendants' motion to dismiss, the Court first outlines other prior litigation that is relevant to this case.

In 2020, Defenders filed suit against the Service, challenging the Service's alleged allowance of the commercial harvesting of horseshoe crabs from Cape Romain in violation of: (1) the National Wildlife Refuge System Improvement Act of 1997 ("Refuge Improvement Act"), 16 U.S.C. §§ 668dd-668ee; (2) the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–44; and (3) the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. §§ 703-12.  See *Defenders of Wildlife v. U.S. Fish & Wildlife Service*, No. 2:20-cv-3657-BHH, 539 F. Supp.3d 543 (D.S.C. 2021).  In *Defenders*, Charles River Laboratories International, Inc. ("Charles River Labs"), a company that relies on the harvest of horseshoe crabs in South Carolina (for the purpose of collecting the bacteria-detecting *Limulus* Amebocyte Lysate from the horseshoe crabs' blood to test the safety of injectable pharmaceutical drugs and vaccines), filed a motion to intervene.  This Court granted the motion to intervene as unopposed and proceeded to consider a number of motions filed by the parties, including the Service's motion to dismiss pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure; Charles River Labs' motion for judgment on the pleadings; and Defenders' motion for preliminary injunction.

The Court held a virtual hearing on Defenders' motion for preliminary injunction on April 15, 2021, and took the matter under advisement.  On April 22, 2021, however, the State of South Carolina, *ex rel.*, Alan Wilson, Attorney General, filed a motion to intervene

in the case pursuant to Rules 24(a) and (b) of the Federal Rules of Civil Procedure.[6] This Court ultimately granted the State's motion to intervene and granted in part Defenders' motion for a preliminary injunction in an order issued on May 12, 2021. *Defenders*, 539 F. Supp.3d 543.  Specifically, the Court found that Defenders made a clear showing of a likelihood of success on its claim that the Service violated the Refuge Improvement Act by failing to authorize the commercial horseshoe crab harvesting by special permit. *Id.* at 557. In so finding, the Court specifically rejected the Service's (and the State's) argument that "the United States' property interest in the lands subject to the 1991 Lease does not permit it to 'authorize' commercial horseshoe crab harvesting by special permit because the 1991 Lease specifically reserved to the State of South Carolina the right to authorize such authority." *Id.* at 557-58.  In other words, this Court disagreed with the Service that the 1991 Lease prevented it from complying with 50 C.F.R. § 27.97, which provides that "conducting a commercial enterprise on any national wildlife refuge is prohibited except as may be authorized by special permit." *Id.* at 558.  The Court explained:

> First, although the 1991 Lease is "subject to [ ] [t]he right of the State of South Carolina to authorize the taking of shellfish, finfish, and other salt water species within the refuge boundary," *the 1991 Lease does not provide that South Carolina's right is exclusive or absolute.* [ ] In fact, it is clear from the parties' behavior that South Carolina's authority under the 1991 Lease is not unfettered, as even the Service admits that it "may limit, and indeed has limited, the scope of this authorization for commercial fishing activity on the leased portions of the Refuge." [ ] Stated plainly, the Service cannot have it both ways–asserting on the one hand that it has no authority but on the other hand that it has some authority.  Thus, the mere fact that the State has the authority to issue a permit authorizing fishing in the first instance (something

---

[6] In its motion to intervene in *Defenders*, the State referenced the 1991 Lease and asserted that it "expressly reserves the taking of salt water species to the State."  The State also referenced the Service's pleadings, noting that the Service also argued that the authorization of harvest from fisheries was within the jurisdiction of the State and not the Service.  *See* No. 2:20-cv-3657-BHH, ECF No. 46 at 3 (citing ECF Nos. 1-1 and 16).

9

everyone agrees about) does not mean that the Service consequently has no concurrent authority to regulate the time, place, and manner of a commercial enterprise to preserve the Refuge's purpose as a sanctuary for migratory birds and endangered and threatened species. *In other words, the 1991 Lease does not establish a stovepiped system wherein the State and the Service remain in separate corners completely isolated from one another, but rather, it envisions a collaborative relationship where both entities respect the authority of the other and work in conjunction to achieve the mutually desirable goal of preserving the Refuge.*

As Judge Norton explained in *Living[t]son v. United States*,[7] the 1991 Lease "is not the only source of the [Service's] authority to regulate the Refuge." No. 2:15-cv-564-DCN, 2016 WL 1274013, *3 (D.S.C. March 31, 2016). As previously explained, Congress tasked the Service with the management of the National Wildlife Refuge System under the Refuge Improvement Act, and Section (b)(5) of that Act permits the Service to "issue regulations to carry out the Act." 16 U.S.C. § 668dd(b)(5). For areas held in less than fee, "the regulations . . . apply only to the extent that the property interest held by the United States may be affected." 50 C.F.R. § 25.11 (emphasis added). The regulation at issue in Plaintiff's second cause of action, 50 C.F.R. § 27.97, plainly states that "conducting a commercial enterprise on any national wildlife refuge is prohibited except as may be authorized by special permit." *Although the 1991 Lease speaks to the State's ability to authorize fishing activity, it does not speak to the specific issue of authorizing a commercial enterprise. Thus, recognizing the existence of the State's authority under the 1991 Lease does not invalidate the Service's regulatory authority.* Here, the Service has not shown that the commercial enterprise at issue cannot possibly affect the property interest held by the United States, and the plain language of § 27.97 would appear to indicate that the commercial enterprise falls within the scope of the such authority. *See* \*559 *Living[t]son*, 2016 WL 1274013, \*4-\*5 (stating that recognizing the plaintiff's easement rights did not invalidate the Service's regulatory authority and also analyzing cases addressing the Service's authority under § 27.97 to regulate activities occurring on non-federal property). *In other words, the Court finds that the fact that South Carolina can authorize certain fishing activities (whether commercial or not) does not override the Service's independent responsibilities and duties under the Refuge Improvement Act.*

539 F. Supp. 3d at 558 (emphasis added) (citations to the record omitted).

In *Defenders*, Charles River Labs filed an appeal of this Court's order, and the

---

[7] Although Westlaw lists the lead plaintiff's name as Livingson, the docket demonstrates that the lead plaintiff's name is actually Livingston. *See Livingston v. United States*, No. 2:15-cv-564-DCN (D.S.C.).

Fourth Circuit stayed this Court's preliminary injunction without explanation and ultimately dismissed the appeal without addressing this Court's finding that the 1991 Lease does not reserve to South Carolina the exclusive or absolute authority to authorize fishing within the Refuge's boundaries. *See Defenders of Wildlife v. U.S. Fish & Wildlife Serv.*, No. 21-1589, ECF No. 19 (4th Cir. 2021).

Also relevant to this matter is prior litigation before the Honorable Richard M. Gergel, which ended in a Consent Order signed by Charles River Labs and the South Carolina Department of Natural Resources. *See Defenders of Wildlife v. Boyles*, No. 2:22-cv-112-RMG (D.S.C. Aug. 23, 2023). In the matter before Judge Gergel, Defenders and SCCCL sued Robert H. Boyles, in his official capacity as Director of the South Carolina Department of Natural Resources; Blaik Keppler, in her official capacity as Acting Deputy Director of the Marine Resources Division of the South Carolina Department of Natural Resources; Melvin Bell, in his official capacity as Director of the Office of Fisheries Management of the South Carolina Department of Natural Resources; and Charles River Labs, alleging that Defendants violated the Endangered Species Act by indirectly committing an impermissible "take" of a threatened migratory shorebird, i.e., the *rufa* red knot, by depriving the bird of a critical food source, namely, horseshoe crab eggs.

Importantly, in the matter before Judge Gergel, the parties entered into a Consent Order on August 23, 2023. No. 2:22-cv-112-RMG, ECF No. 160. Pursuant to the Consent Order, the parties agreed to a prohibition on the harvesting of horseshoe crabs during the spawning season (March 15 – June 15) from areas identified as critical habitat areas of red knot shorebirds in certain areas, including Cape Romain, for a period of five years. *See id.* Pursuant to the Consent Order in Judge Gergel's case, therefore, the State will not

authorize the harvest of horseshoe crabs by Charles River Labs in Cape Romain until 2028 at the earliest.

## STANDARDS OF REVIEW

### I.     Rule 12(b)(1)

A Rule 12(b)(1) motion for lack of subject matter jurisdiction raises the fundamental question of whether a court has jurisdiction to adjudicate the matter before it.  Fed. R. Civ. P. 12(b)(1).  In determining whether jurisdiction exists, the court is to "regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."  *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982) ).  "The moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."  *Id.* (citation omitted).  The plaintiff bears the burden of proof on questions of subject matter jurisdiction.  *See Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).

### II.    Rule 12(b)(6)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) examines the legal sufficiency of the facts alleged on the face of a plaintiff's complaint.  *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  To survive a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' "  *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible when the factual content allows the court to reasonably infer that the defendant is liable for the misconduct alleged. *Id.* When considering a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). The Supreme Court has explained that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

### DISCUSSION

In the motion to dismiss, Intervenor-Defendants first assert that this Court lacks subject matter jurisdiction because this case is not ripe for adjudication. After consideration, the Court agrees.

The "ripeness" requirement originates in the "case or controversy" constraint of Article III, and presents a "threshold question [ ] of justiciability." *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne*, LLC, 713 F.3d 187, 195 (4th Cir. 2013); *see also DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (explaining that "[i]f a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so"). "To determine if a case is ripe, we 'balance the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration.'" *Lansdowne*, 713 F.3d at 198 (quoting *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006)).

"The doctrine of ripeness prevents judicial consideration of issues until a controversy is presented in clean-cut and concrete form." *Miller*, 462 F.3d at 318-19 (citation and

internal quotation marks omitted). As the United States Supreme Court has explained, the purpose of the ripeness doctrine is to require courts to avoid taking premature judicial action, thereby preventing them from becoming entangled in "abstract disagreements." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977).

A case is fit for adjudication "when the action in controversy is final and not dependent on future uncertainties." *Miller*, 462 F.3d at 319; *Franks v. Ross*, 313 F.3d 184, 195 (4th Cir. 2002). Stated another way, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation and internal quotation marks omitted); *see also Bryant Woods Inn, Inc. v. Howard Cnty., Md.*, 124 F.3d 597, 602 (4th Cir.1997).

Here, the State asserts that its claims are fit for adjudication right now because "the State cannot exercise its authority over the harvesting of saltwater species and allow it or disallow it unless the United States says." (ECF No. 25 at 13.) The State continues:

> The Memorandum takes away a right that the State has under the lease. Similarly, the regulation closes Marsh Island for more than half the year which means that the State has no permitting authority there during that time which is also contrary to the lease. The Compatibility Determination is consistent with this removal of State authority as it applies to horseshoe crabs.

(*Id.* at 13-14.)

Critically, however, nowhere does the State allege any facts to show that it has actually *tried* to exercise its authority over the harvesting or taking of any saltwater species but has been prevented from doing so by the federal Defendants' challenged conduct (the

2009 Regulation, the 2021 Memorandum, or the 2023 Compatibility Determination). In other words, the State does not allege any facts to show that some individual or company has actually come forward seeking authorization from the State to take shellfish, finfish, or other salt water species from within the Refuge boundary, or that the State has been forced to disallow any such request due to the federal Defendants' challenged conduct.[8]

Furthermore, although the State asserts that this case is "about more than horseshoe crabs," it is clear that this case centers around the Service's management of horseshoe crab harvesting in the Refuge. (ECF No. 25 at 14.) Indeed, nowhere does the amended complaint even reference any other fishery that has existed, currently exists, or may soon exist.

With respect to horseshoe crab harvesting specifically, the sole harm alleged by the State is that the Service's actions "limit the scope of the State's authorization rights under the lease." (ECF No. 5 ¶ 28.) But as a practical matter, in light of the Consent Order entered in Judge Gergel's case, it does not appear that there will be any horseshoe crab harvesting for the State to even authorize until 2028 at the earliest. Thus, the federal Defendants' challenged conduct, at least with respect to horseshoe crabs, which is the only salt water species specifically identified in the amended complaint, will not have any practical effect on the State's alleged authorization rights until 2028 at the earliest.

Therefore, with respect to the hardship prong of the ripeness inquiry, the Court finds

---

[8] At the hearing, the State asserted that "the injury is right now, because the State's hands are tied right now," but the State was unable to identify *any* examples of when the federal government actually prevented the State from allowing or disallowing the taking of any salt water species in the Refuge. (*See* 8/28/24 Transcript at 16-19.) Of course, to the extent that some individual or company comes forward at some future time seeking such authorization, then perhaps the State's claims would be ripe. *Texas v. United States*, 523 U.S. at 300 ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.").

15

the analysis straightforward. Stated plainly, the hardship could not be any less immediate. As the Intervenor-Defendants correctly assert in their reply:

> At most, the State has shown that the Service's Challenged Conduct *could* affect some *unidentified* fishery in the Refuge at some *indefinite* point in the future. With no "'practical harm'" to the State's alleged authority over saltwater species on the horizon, the State's case presents an "'abstract disagreement[]'" that is unripe for judicial review. *See* ECF No. 17 at 13-14 (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733-34 (1998); *Abbott Laby's v. Gardner*, 387 U.S. 136, 148-49 (1967)).
>
> All the State has alleged here is "the mere threat of potential injury," which "is too contingent or remote to support present adjudication." *Thrifty Rent-A-Car Sys., Inc. v. Thrifty Auto Sales of Charleston, Inc.*, 849 F. Supp. 1083, 1086 (D.S.C. 1991). If anyone applies to SCDNR for a permit to harvest or fish in Cape Romain, in a fishery that is actually affected by the Service's Challenged Conduct, the State "will have ample opportunity to later bring its legal challenge at a time when harm is more imminent and more certain." *Ohio Forestry Ass'n*, 523 U.S. at 733.

(ECF No. 32 at 4-5 (emphasis in original).)

For the above reasons, the Court agrees with Intervenor-Defendants that this Court has no business deciding this case at this time and thereby becoming entangled in an abstract disagreement. Accordingly, the Court finds that this action is subject to dismissal pursuant to Rule 12(b)(1) for lack of ripeness.

Next, the Court also finds that even if it is incorrect and the State's claims *are* ripe for adjudication at this time, this action still suffers from an additional fatal flaw, which is the fact that *all* of the State's claims hinge on their assertion that the 1991 Lease reserved to the State the *exclusive* authority over all aspects of the taking of salt water species from within the Refuge. Importantly, in *Defenders*, this Court considered exactly this issue and specifically rejected it. Moreover, even if the Court's prior decision in *Defenders* holds no precedential value, the Court finds no reason to reach a different conclusion today.

16

As this Court explained in *Defenders*, although the 1991 Lease states that it "is 'subject to [ ] [t]he right of the State of South Carolina to authorize the taking of shellfish, finfish, and other salt water species within the refuge boundary,' *the 1991 Lease does not provide that South Carolina's right is exclusive or absolute*." *Defenders*, 539 F. Supp. 3d at 558 (emphasis added); *see also id.* at 556, n. 4 ("[T]he 1991 Lease *does not state* that it reserves to the State of South Carolina exclusive, absolute, or unfettered authority to regulate all aspects of commercial fishing.") (emphasis added). Had South Carolina wished to reserve the exclusive, absolute, or unfettered right to regulate all aspects of the taking of salt water species, then it could have done so in the plain language of the 1991 Lease.[9]

Next, the Court notes that the very next sentence of the 1991 Lease provides that the "land is being leased for administration by the Secretary of the Interior through the United States Fish and Wildlife Service *as a national wildlife refuge*." (ECF No. 1-1 at 2 (emphasis added).) As this Court previously explained in *Defenders*, "Congress tasked the Service with the management of the National Wildlife Refuge System under the Refuge Improvement Act, the mission of which is to regulate the National Wildlife Refuge System for the purposes of '[conserving, managing, and restoring] fish, wildlife, and plant resources and their habitats . . . for the benefit of present and future generations of Americans." 539 F. Supp. 3d at 556 (quoting 16 U.S.C. § 668dd(a)(2); *see also* 16 U.S.C. § 668dd(a)(3)(A) ("stating that "it is the policy of the United States that . . . each refuge will be managed to fulfill the mission of the System, as well as the specific purposes for which that refuge was

---

[9] At the hearing in this matter, the Court asked counsel for the State where the word "exclusive" appeared in the lease, and counsel admitted that it did not, although counsel asserted that it was not necessary. (8/28/2024 Transcript at 11-12.)

established."). Thus, as Judge Norton also noted in *Livingston*, the 1991 Lease "is not the only source of the [Service's] authority to regulate the Refuge." No. 2:15-cv-564-DCN, 2016 WL 1274013, *3 (D.S.C. March 31, 2016); *see also Defenders*, 539 F. Supp. 3d at 558-59 (explaining that the fact that State has the authority to authorize fishing does not invalidate the Service's concurrent regulatory authority to manage Cape Romain as a wildlife refuge).

Here again, the Court is still not convinced by the State's assertion that the 1991 Lease reserved to it the *exclusive* right to authorize all aspects of the taking of saltwater species from the Refuge. First, such a finding is not supported by the plain language of the 1991 Lease. Second, such a finding ignores the Service's concurrent regulatory mandate under the Refuge Act as well as its authority under the Property Clause. *See Defenders*, 539 F. Supp. 3d at 559 ("[T]he fact that South Carolina can authorize certain fishing activities (whether commercial or not) does not override the Service's independent responsibilities and duties under the Refuge Improvement Act."). Ultimately, because the Court finds no basis in the 1991 Lease or the applicable federal law to support the State's claimed "exclusive" authority, and because all of the State's claims depend on such claimed "exclusive" authority, the Court also finds (to the extent the Court has subject matter jurisdiction if the State's claims are in fact ripe), that the State's claims are subject to dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a plausible claim.

## CONCLUSION

In conclusion, for the reasons set forth on the record during the hearing on August 28, 2024, and for the reasons set forth above, the Court finds that it lacks jurisdiction to

consider the State's claims due to lack of ripeness. Accordingly, the Court hereby grants Intervenor-Defendants' motion to dismiss (ECF No. 17) pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, and the Court dismisses this case without prejudice.

**IT IS SO ORDERED.**

/s/Bruce H. Hendricks
United States District Judge

October 17, 2024
Charleston, South Carolina